# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: <br> Instagram accounts identified as: @censored_camel, <br> UID 41069262647; and @young_kvnvk_dierich, <br> UID 8011706733; that are within the possession, <br> custody, or control of Facebook Inc., 1601 Willow <br> Road, Menlo Park, California | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 21-04783M

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| Title 18, USC, Section 371 | Conspiracy |
| Title 18, USC, Section 844(i); | Attempting to Maliciously Damage by Means of an Explosive Real Property Used in Any Activity Affecting Interstate Commerce |
| Title 18, USC, Section 2339B | Conspiring and Attempting to Provide, and Providing, Material Support or Resources to a Designated Foreign Terrorist Organization). |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

DANIELLE QUIROS, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____October_____, 2021_

City and State: _____Los Angeles, CA_____

_____
*Judge's signature*

Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Judith Heinz, (213) 894-7280

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Instagram accounts identified as:

Instagram account @censored_camel, UID 41069262647; and

Instagram account @young_kvnvk_dierich, UID 8011706733; (collectively, the "SUBJECT ACCOUNTS") that are within the possession, custody, or control of Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I. SEARCH PROCEDURES

1.  The warrant will be presented to personnel of Facebook, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.  To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.  The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.  With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred (1) between June 14, 2018 and August 31, 2020 for Instagram account @young_kvnvk_dierich, and (2) between August 31, 2020 and the date of this warrant for Instagram account @censored_camel, UID 41069262647,[7] including:

---

[7] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

iv.   All data and information associated with the profile page of the SUBJECT ACCOUNT, including photographs, "bios," and profile backgrounds and themes;

v.   All communications or other messages sent or received by the SUBJECT ACCOUNT, including via Instagram Direct;

vi.   All user content created, uploaded, or shared by the SUBJECT ACCOUNT, including any comments made by the SUBJECT ACCOUNT on photographs, videos, or other content;

vii. All photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the SUBJECT ACCOUNT;

viii.    All location data associated with the SUBJECT ACCOUNT, or with photographs, videos, or other content, including geotags;

ix. All records of Instagram searches performed by the SUBJECT ACCOUNT, including all past searches saved by the SUBJECT ACCOUNT;

x.  A list of all of the people that the user of the SUBJECT ACCOUNT follows on Instagram and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any "friends" of the user;

xi. A list of all users that the SUBJECT ACCOUNT has "unfollowed" or blocked;

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment,

including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNTS.

        ii.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

        iii.  All privacy and account settings of the SUBJECT ACCOUNTS, including past and present account status;

        iv.   All information about connections between the SUBJECT ACCOUNTS and third-party websites and applications;

**III.  INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.   For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

        a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 844(i)(Attempting to Maliciously Damage by Means of an Explosive Real Property Used in Any Activity Affecting Interstate Commerce); and Title 18, United States Code, Section 2339B

(Conspiring and Attempting to Provide, and Providing, Material Support or Resources to a Designated Foreign Terrorist Organization) (the "SUBJECT OFFENSES"), namely:

       i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts;

       ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used;

       iii. Information related to terrorism, or the support of terrorism, including text messages, photographs, images, logs, phonebooks, documents, browsing history, communications on third party applications, location information, calendar entries, stored audio communications, written notes, contacts, emails, and web browsing history;

       iv.  Information related to explosives or intent to damage property, including text messages, photographs, images, logs, phonebooks, documents, browsing history, communications on third party applications, location information, calendar entries, stored audio communications, written notes, contacts, emails, and web browsing history;

       v.   Information related to involvement in the Subject Offenses by Sean Ziegenbein, Abraham Qurashi and others yet unknown to include information relating to their identities, whereabouts, communications, and methods of contact and communication; and

     b.  All records and information described above in Section II.10.b.

vii

## IV.   **PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

> Danielle Quiros
> 11000 Wilshire Blvd. #1700 Los Angeles, CA 90024
> Phone:   (310)996-4948
> E-mail:  dquiros@fbi.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, DANIELLE QUIROS, being duly sworn, declare and state as
follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation and have been so employed since July 2018.  I am
currently assigned to the Joint Terrorism Task Force ("JTTF") of
the Los Angeles Field Division.  During my career as a FBI
Special Agent, I have participated in numerous criminal and
counterterrorism investigations, including a counter-terrorism
investigation utilizing various investigative tools and
techniques that ultimately led to the arrest of an individual on
terrorism-related charges.  As a result of my experience, I am
familiar with strategy, tactics, methods, tradecraft, and
techniques of criminals, terrorists, and their accomplices.
During my employment with the FBI, I attended academy training
at the FBI Academy in Quantico, Virginia.  Since graduation from
the FBI Academy, I have received both formal and informal
training from the FBI regarding criminal and counterterrorism
investigations.  My training has included extensive instruction
in criminal investigative techniques, international terrorism,
law enforcement techniques, federal criminal statutes, execution
of search and arrest warrants, and legal principles relating to
criminal violations of the United States Code.  Since graduating
from the academy and during my employment as a Special Agent, I
have used the training provided and skills I gained throughout
the course of my investigations, to include, but not be limited

to, obtaining search warrants and analyzing the electronic data seized as a result of such searches.

2.   I make this affidavit in support of an application for a warrant for information associated with the accounts identified as:

Instagram account @censored_camel, UID 41069262647; and

Instagram account @young_kvnvk_dierich, UID 8011706733; (collectively, the "SUBJECT ACCOUNTS") that are stored at premises controlled by Facebook, Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1601 Willow Road, Menlo Park, California.[1]  The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") by and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not
*(footnote cont'd on next page)*

to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

3.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 844(i) (Attempting to Maliciously Damage by Means of an Explosive Real Property Used in Any Activity Affecting Interstate Commerce); and Title 18, United States Code, Section 2339B (Conspiring and Attempting to Provide, and Providing, Material Support or Resources to a Designated Foreign Terrorist Organization).

---

content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## II.   SUMMARY OF PROBABLE CAUSE

5.    From approximately 2018 to August 18, 2020, in Los Angeles, California and elsewhere, Sean ZIEGENBEIN ("ZIEGENBEIN") used Instagram Account @young_kvnvk_dierich on which he posted images and captions that appear to support terrorism and terrorism activities.

6.    In January 2020, ZIEGENBEIN admitted communicating with ISIS personnel to "gain information about the enemy" but claimed to have stopped these communications when asked to travel to Canada for training.

7.    In June 2020, while ZIEGENBEIN was living with a long-time acquaintance, Abraham Quraishi ("Quraishi"), in St. Petersburg, Florida, the St. Petersburg Police Department ("SPPD") arrested Quraishi, who was then in possession of a handgun and who had assaulted law enforcement officers during a protest.  Quraishi was subsequently charged with Making or Discharging a Destructive Device and Terrorist Activity in

violation of Florida State law; his previous October 25, 2021
trial date has been vacated and not yet re-scheduled.

8.    After Quraishi's arrest, SPPD executed a search
warrant on Quraishi's cell phone and saw, among other things,
(1) photographs of ZIEGENBEIN and Quraishi in possession of
firearms and (2) a video dated May 31, 2020 showing ZIEGENBEIN
throwing a lit Molotov cocktail at the parking lot of Vertical
Ventures (an indoor rock-climbing gym) in St. Petersburg,
Florida whose activities affect interstate commerce.  I know,
based on my training and experience that a Molotov cocktail is
an incendiary device.  Based on the video and witness
identification, SPPD arrested ZIEGENBEIN on August 19, 2020 for
Making or Discharging a Destructive Device in violation of
Florida State law.

9.    After his arrest in Florida, ZIEGENBEIN began using,
in August 2020, a different Instagram account (@censored_camel),
the content of which has not been publicly accessible.  From
approximately August 2020 to the present, in Los Angeles,
California and elsewhere, ZIEGENBEIN has used the Instagram
Account @censored_camel.  Since May 2021, ZIEGENBEIN's Instagram
Account @censored_camel has been in almost daily contact with
Quraishi.

10.   On July 25, 2021, the FBI confirmed based on
surveillance that ZIEGENBEIN was residing in the Los Angeles,
California, area.

11.   As explained further below, there is probable cause to
believe the SUBJECT ACCOUNTS contain evidence, fruits, and

instrumentalities of violations of Title 18, United States Code,
Section 371 (Conspiracy); Title 18, United States Code, Section
844(i) (Attempting to Maliciously Damage by Means of an
Explosive Real Property Used in Any Activity Affecting
Interstate Commerce); and Title 18, United States Code, Section
2339B (Conspiring or Attempting to Provide, and Providing,
Material Support or Resources to a Designated Foreign Terrorist
Organization).

## III. __LEGAL BACKGROUND__

12.  Title 18, United States Code, Section 844(i) prohibits
attempts to damage or destroy, by means of fire or an explosive,
any building, vehicle, or other real or personal property used
in interstate or foreign commerce or in any activity affecting
interstate or foreign commerce.

13.  Title 18, United States Code, Section 2339B prohibits
conspiring or attempting to provide, or providing, material
support or resources, to a designated foreign terrorist
organization.  The term "material support or resources" means
any property, tangible or intangible, or service, including
weapons, lethal substances, explosives, and personnel (1 or more
individuals who may be or include oneself).

14.  On or about October 15, 2004, the U.S. Secretary of
State designated al Qaeda in Iraq ("AQI"), then known as Jam'at
al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization
("FTO") under Section 219 of the Immigration and Nationality Act
(the "INA") and as a Specially Designated Global Terrorist under
section 1(b) of Executive Order 13224.  On or about May 15,

2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

### IV.  STATEMENT OF PROBABLE CAUSE

ZIEGENBEIN's Use of the SUBJECT ACCOUNTS

15.  Based on my training and experience and my knowledge of this investigation, I know that Instagram is an app used primarily on cell phones.

16.  The information described herein related to ZIEGENBEIN's use of Instagram indicates to me, based on my training and experience, that ZIEGENBEIN has used his cell phone to access his Instagram account, and to capture images via the cell phone's camera and/or to search the internet with the cell phone for images, and then to post those images onto his Instagram account.

17.  Based on information provided to the FBI by USAA Federal Savings Bank, I know that on his account application, ZIEGENBEIN provided the telephone number: 424-443-9563.

18.  Based on records obtained by FBI from the PROVIDER, Charter Communications, Spectrum, and my consultation of ip2location.com, I know that in July and December 2018, and in March 2019, Internet Protocol ("IP") addresses associated with Los Angeles, California, were used to log into the Instagram Account @young_kvnvk_dierich.

19.  Based on information provided to the FBI by AT&T Wireless and the PROVIDER, and my consultation of the ip2location.com database, I know:

    a.  Between May and October 2021, IP addresses associated with Los Angeles, California were used approximately 112 times to log into the Instagram Account @censored_camel; and

    b.  The user of the Instagram Account @censored_camel appears to use Instagram frequently throughout the day, which I believe, based on my training, experience and knowledge of this investigation, is consistent with using a cell phone to access Instagram as described above in paragraph 16.

20.  Based on my knowledge of the investigation, I know that on the following dates, preservation letters were sent to the PROVIDER requesting that information associated with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f):

     a.   On approximately September 11, 2019, and September 2, 2020, preservation letters were sent for Instagram account @young_kvnvk_dierich; and

     b.   On approximately September 29, 2021, a preservation letter was sent for Instagram account @censored_camel.

## ZIEGENBEIN's INSTAGRAM ACCOUNT young kvnvk dierich

21.   Based on information received by FBI from the PROVIDER, I know that on June 14, 2018, the Instagram Account @young_kvnvk_dierich was created.

22.   Based on my review of publicly accessible postings by the Instagram Account @young_kvnvk_dierich, I know the following:

     a.   Based on my review of ZIEGENBEIN's California driver's license photograph, my surveillance of him in the Los Angeles area during September/October 2019, and my observations of him during an in-person interview in January 2020, I recognize photos on the Instagram Account @young_kvnvk_dierich to contain images of ZIEGENBEIN. In addition, as stated below, ZIEGENBEIN admitted to me that the Instagram Account @young_kvnvk_dierich was his account and that he posted all of the images described below in this paragraph.

b.   On September 6, 2018, ZIEGENBEIN posted a picture of the following Arabic-language quotation: "Aaodo bilah min alshaytan alrajeem," which an internet translation service translates into the English-language as, "I ask in God to keep me away from the evil Satan."  With the picture, ZIEGENBEIN posted, "When I fantasize about and plan to do violence a Saudi brother told me to say . . . "



c.   On September 7, 2018, ZIEGENBEIN republished an image of a Nike "just do it" advertisement into which Usama Bin Laden's face had been inserted, as well as the following words over Bin Laden's face: "Believe in something.  Even if it means sacrificing everything."



d.    On September 15, 2018, ZIEGENBEIN posted a photograph of himself wearing a hooded winter coat, holding a gun in his hand, with the following caption: "Old pic of me two years ago happiness is a new gun in my hand."



e.   On May 16, 2019, ZIEGENBEIN posted a photograph of himself, with a full beard, wearing a headscarf (known as a keffiyeh) and a necklace with a gold Rocket Propelled Grenade ("RPG") charm.



ZIEGENBEIN and his Roommate, Abraham Quraishi, in St. Petersburg, Florida

23.   Based on my review of FBI documents authored by, and my communications with, FBI Tampa (Florida) Special Agents, I know the following:

a.   On or about June 3, 2020, the SPPD arrested ZIEGENBEIN's roommate, Quraishi, who was in the possession of a firearm -- specifically a handgun secured in his waistband -- and who assaulted law enforcement officers during a protest in front of the St. Petersburg Police Department, in St. Petersburg, Florida.

12

b.   ZIEGENBEIN informed SPPD detectives on June 9, 2020 that he met his roommate (Quraishi) when they both attended St. John's Military Academy in Salinas, Kansas.[3]

c.   During the commission of the criminal activity, ZIEGENBEIN's roommate (Quraishi) was in a crowd of approximately 30 people; it is unknown if ZIEGENBEIN was among the 30 people.

d.   After ZIEGENBEIN's roommate (Quraishi) was arrested, on or about June 3, 2020, SPPD, pursuant to a warrant, searched ZIEGENBEIN roommate's cellular phone and found:

i.   A photograph dated February 29, 2020 of ZIEGENBEIN at a gun range holding a rifle;

ii.   A photograph dated March 16, 2020 of ZIEGENBEIN and his roommate holding a handgun and a rifle with a banana clip and pointing one finger towards the sky;[4]

iii. A video dated April 2020 of ZIEGENBEIN and his roommate (Quraishi) cleaning handguns; and

iv.   A video dated May 31, 2020 showing ZIEGENBEIN throwing a lit Molotov cocktail at the parking lot of Vertical Ventures (an indoor rock climbing gym) in St. Petersburg, Florida.[5]

---

[3] I know, based on statements made by ZIEGENBEIN's father that ZIEGENBEIN attended St. John's Military Academy during his sophomore and junior years of high school.

[4] Based on my training, experience, and knowledge of this investigation, I know that pointing one finger towards the sky is a gesture used to symbolize the "oneness of God" and rejection of other views, including Western beliefs, and calling for the destruction of the West.

[5] I know that Vertical Ventures in St. Petersburg, Florida is an indoor rock climbing gym based on my review of its website
*(footnote cont'd on next page)*

e.   ZIEGENBEIN's roommate (Quraishi) was charged with Making or Discharging a Destructive Device and Terrorist Activity in violations of Sections 790.161 and 775.30, Florida Statutes, respectively.  He was released on GPS monitoring via an ankle-monitor; his previous October 25, 2021 trial date has been vacated and not yet re-scheduled.

f.   SPPD arrested ZIEGENBEIN on August 19, 2020 for Making or Discharging a Destructive Device in violation of Section 790.161, Florida Statutes.

g.   In February 2021, the Florida State Attorney's office concluded prosecution was not warranted as of that time and dismissed the charges against ZIEGENBEIN.

ZIEGENBEIN'S INSTAGRAM ACCOUNT "CENSORED CAMEL"

24.  Based on my training and experience, information received by FBI from the PROVIDER, my consultation of the ip2location.com database, and FBI investigation into the Instagram accounts with which ZIEGENBEIN's Instagram Account censored_camel has had contact, I know the following information:

a.   On August 31, 2020 (after throwing the Molotov cocktail), ZIEGENBEIN created an Instagram Account from an IP address associated with St. Petersburg, Florida with a first

---

on the internet.  During my phone interview on September 9, 2021 of the manager of Vertical Ventures, I learned that Vertical Ventures purchases numerous products from vendors located outside Florida for use in the gym.  Thus, there is probable cause to believe that Vertical Ventures is a building/real property used in an activity affecting interstate commerce.  I also learned from the manager that although the Vertical Ventures parking lot was not damaged by the Molotov cocktail, there was broken glass in the parking lot.

name composed of Arabic writing, a vanity name of censored_camel, and a registration email of sean.ziegenbein1924@gmail.com.[6]

b.    Between May 12, 2021 and September 1, 2021, ZIEGENBEIN's Instagram Account censored_camel has been in contact with approximately 134 other Instagram accounts, many of which are not publicly viewable;

c.    One account with which the Instagram Account censored_camel has been in contact and which was publicly viewable included the following:

i.    An image of two armed men pointing rifles at the camera;

ii.    A compilation video of multiple images and videos, including, but not limited to, a video of a rocket striking a residential structure, a video of what appears to be an improvised explosive device detonating underneath United States military vehicles, and a video with explosions that contains an emoticon image of a hand with just the index finger pointed up and the words "ALLAHU AKBAR."  Based on my training, experience, and knowledge of this investigation, I know these images and videos were part of a story that was posted on Instagram between February and May 2021.

---

[6] Based on information received by FBI from Google, Inc., and my consultation of ip2location.com, I know that the gmail account, sean.ziegenbein1924@gmail.com, was created on June 9, 2020, using IP address 35.142.128.173, which is associated with St. Petersburg, Florida, by someone giving the name sean ziegenbein.  I submit there is probable cause to believe that ZIEGENBEIN created and has used the Instagram Account censored_camel.

iii. An image of a man with his face covered sitting in a military-type vehicle with the words "Proud to be Anabari" inscribed on the top portion of the image. Based on my training, experience, and knowledge of this investigation, I know this caption may be a reference to Abu Ali al-Anbari, the former governor of the Islamic State of Iraq and the Levant in Syria territories ("ISIS").

d. Since May 12, 2021, ZIEGENBEIN's Instagram Account @censored_camel has been in contact with the Instagram account of his former St. Petersburg roommate, Quraishi, almost daily.

Interviews of ZIEGENBEIN and his father

25. During my interview of ZIEGENBEIN's father on December 12, 2019, he told me the following:

a. ZIEGENBEIN had behavioral issues throughout his adolescence;

b. When ZIEGENBEIN resided with his mother, she called the police because of his behavior;

c. During a psychological evaluation, ZIEGENBEIN admitted to being physically abused by his stepfather;

d. ZIEGENBEIN continued to reside with his mother for several more years before ZIEGENBEIN's father took custody;

e. While residing with his father, ZIEGENBEIN continued to have behavioral issues;

f. ZIEGENBEIN's father sent ZIEGENBEIN to numerous military schools and foster families;

g.   ZIEGENBEIN attended St. John's Military Academy during his sophomore and junior years of high school;

h.   ZIEGENBEIN's father stated that ZIEGENBEIN began studying the Qur'an while at a school in Utah; and

i.   ZIEGENBEIN's father stated that ZIEGENBEIN complained frequently about being targeted by other individuals because ZIEGENBEIN was different; ZIEGENBEIN's father stated that neither himself nor ZIEGENBEIN could think of any characteristics that made ZIEGENBEIN different.

26.   During my interview of ZIEGENBEIN in Los Angeles on January 6, 2020, he told me the following:

a.   ZIEGENBEIN attempted to join the United States military several years prior to the interview, but his application was denied;

b.   ZIEGENBEIN's cousin was a U.S. military member and ZIEGENBEIN admired his cousin;

c.   ZIEGENBEIN's cousin committed suicide and ZIEGENBEIN blamed the military for his cousin's depression;

d.   In 2018, ZIEGENBEIN obtained a license to be an armed security guard but had not applied for any related employment;

e.   To obtain the license to be an armed security guard, ZIEGENBEIN had to demonstrate his proficiency with firearms, and to do this, he attended a course in San Bernardino, California;

f.    While taking the course to obtain the license to be an armed security guard, the instructors were envious of ZIEGENBEIN because he was more skilled;

g.    When ZIEGENBEIN departed from the firearms range (while taking the course) and was driving home, he crashed his vehicle;

h.    ZIEGENBEIN said that a group of police officers saw him at the range and were jealous of him; therefore, the officers tampered with his vehicle which ultimately caused his crash;

i.    ZIEGENBEIN could not provide proof that the officers ever came into contact with his vehicle;

j.    ZIEGENBEIN enjoys shooting firearms and has occasionally gone to a range or shot firearms with his grandfather;

k.    ZIEGENBEIN has gone to a firearms range, possibly called Insight, located in Artesia, California;

l.    When ZIEGENBEIN shoots with his grandfather, they do not shoot in a range, but in a field or other open area;

m.    ZIEGENBEIN's grandfather resides in Exeter, California and is a supporter of the Second Amendment;

n.    ZIEGENBEIN prefers shooting a 9mm handgun because the ammunition is less expensive;

o.    When ZIEGENBEIN was living in a half-way house, he found a Qur'an and converted to Islam;

p.    ZIEGENBEIN has communicated with Islamic State members online to "gain information about the enemy";

18

ZIEGENBEIN stopped communications with Islamic State members because the other person wanted ZIEGENBEIN to travel to Toronto [Canada] for training; and ZIEGENBEIN admitted that the Instagram Account young_kvnvk_dierich was his account and that he posted all of the images described above.  He said that enjoys posting images about terrorism on his social media account to be "ironic" and get a reaction out of people.

### V.    BACKGROUND ON SERVICES PROVIDED BY INSTAGRAM

27.  Based on a review of information provided by Instagram regarding its services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Instagram.

28.  Instagram is a service owned by Facebook and is a free-access social networking service, accessible through its website and its mobile applications, that allows subscribers to acquire and use Instagram accounts, like the SUBJECT ACCOUNT[S], through which users can share messages, multimedia, and other information with other Instagram users and the general public.

29.  Facebook collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address, telephone numbers, credit card or bank account number, and other personal identifiers.  Facebook keeps records of changes made to this information.

30.  Facebook also collects and retains information about
how each user accesses and uses Instagram.  This includes
information about the IP addresses used to create and use an
account, unique identifiers and other information about devices
and web browsers used to access an account, as well as session
times and durations.  Because every device that connects to the
Internet must use an IP address, IP address information can help
to identify which computers or other devices were used to access
a SUBJECT ACCOUNT.

31.  Each Instagram account is identified by a unique
username chosen by the user.  Users can change their usernames
whenever they choose but no two users can have the same
usernames at the same time.  Instagram users can create multiple
accounts and, if "added" to the primary account, can switch
between the associated accounts on a device without having to
repeatedly log-in and log-out.

32.  Instagram users can also connect their Instagram and
Facebook accounts to utilize certain cross-platform features,
and multiple Instagram accounts can be connected to a single
Facebook account.  Instagram accounts can also be connected to
certain third-party websites and mobile apps for similar
functionality.  For example, an Instagram user can "tweet" an
image uploaded to Instagram to a connected Twitter account or
post it to a connected Facebook account, or transfer an image
from Instagram to a connected image printing service.  Facebook
maintains records of changed Instagram usernames, associated

Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

33.  Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

34.  Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users.  Facebook retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Facebook to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

35.  Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

36.   One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

37.   Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

38.   An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

39.   Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are

removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

40.   Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

41.   Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

42.   Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to

23

make them more easily searchable and can be "followed" to
generate related updates from Instagram.  Facebook retains
records of a user's search history and followed hashtags.

43.  Facebook collects and retains location information
relating to the use of an Instagram account, including user-
entered location tags and location information used by Facebook
to personalize and target advertisements.

44.  Facebook also uses information it gathers from its
platforms and other sources about the demographics, interests,
actions, and connections of its users to select and personalize
ads, offers, and other sponsored content.  Facebook maintains
related records for Instagram users, including information about
their perceived ad topic preferences, interactions with ads, and
advertising identifiers.  In my training and experience, this
data can provide information that can also be used to identify
the user(s) of a SUBJECT ACCOUNT.

45.  In some cases, Instagram users may communicate
directly with Facebook about issues relating to their accounts,
such as technical problems, billing inquiries, or complaints
from other users.  Social networking providers like Facebook
typically retain records about such communications, including
records of contacts between the user and the provider's support
services, as well as records of any actions taken by the
provider or user as a result of the communications.

46.  For each Instagram user, Facebook collects and retains
the content and other records described above, sometimes even
after it is changed by the user (including usernames, phone

24

numbers, email addresses, full names, privacy settings, email
addresses, and profile bios and links).

47.   In my training and experience, the stored
communications and files described above connected to a SUBJECT
ACCOUNT may provide direct evidence of the offenses under
investigation and may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.  In addition, emails, instant
messages, internet activity, documents, and contact and calendar
information can lead to the identification of co-conspirators
and instrumentalities of the crimes under investigation.
In my training and experience, a user's account activity, logs,
stored electronic communications, and other data retained by
Facebook can also be used to identify the user(s) of a SUBJECT
ACCOUNT.  For example, subscriber information, IP address logs,
email and messaging logs, documents, and photos and videos (and
the data associated with the foregoing, such as geo-location,
date and time) may be evidence of who used or controlled the
account at a relevant time.  Such information also allows
investigators to understand the geographic and chronological
context of access, use, and events relating to the crimes under
investigation.

## VI.   BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

48.   I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at

a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the email addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

49.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If

the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

50.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

51.  This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,

regardless of where the PROVIDER has chosen to store such information.

52.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example,

if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

### VII. <u>REQUEST FOR NON-DISCLOSURE</u>

53.  Pursuant to 18 U.S.C. § 2705(b), I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscriber(s) of the SUBJECT ACCOUNTS, of
the existence of the warrant until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date the requested warrant is signed by the
magistrate judge, or such later date as may be set by the Court
upon application for an extension by the United States.  There
is reason to believe that such notification will result in:
(1) flight from prosecution; (2) destruction of or tampering
with evidence; (3) intimidation of potential witnesses; or
(4) otherwise seriously jeopardizing the investigation.  Although
the subject of the investigation has been interviewed by an FBI
Special Agent, he is not aware of the extent of the FBI's
scrutiny of his activities.  In addition, if the PROVIDER or
other person notifies the targets of the investigation that a
warrant has been issued for a SUBJECT ACCOUNT, the targets
and/or accomplices might mask their online activity and
seriously jeopardize the investigation.

## VIII.      __CONCLUSION__

54.   Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


_____
DANIELLE QUIROS, Special Agent
FEDERAL BUREAU OF
INVESTIGATION


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2021.


_____
UNITED STATES MAGISTRATE JUDGE


30